27548. C. I. T. CORPORATION *v.* CARTER.

DECIDED DECEMBER 5, 1939. REHEARING DENIED DECEMBER 19, 1939.

*Woodruff & Ward, Wright & Covington,* for plaintiff.
*Maddox & Griffin,* for defendants.

BROYLES, C. J. On March 12, 1938, Ira Lee Carter instituted a bail-trover action against the C. I. T. Corporation and "A. E. Jackson, doing business as Rome Automobile Company." By paragraph the material averments of the petition are substantially as follows: 3. The defendants are in possession of a certain automobile, "of the value of $700, to which petitioner claims the right of possession." 4. An agent of C. I. T. Corporation, whose surname is Smith, "while acting in behalf of . . said defendant corporation unlawfully . . took possession of said automobile and the same is now stored in the garage . . of said defendant Jackson." 5. Defendants "refused to deliver the above-described property to petitioner or to pay him the rental value thereof and . . the monthly value of said automobile for hire is $30." The substance of the defendants' answer is as follows: "2. Defendants deny the allegations contained in paragraphs 3, 4, and 5 of said petition except that defendants admit that at the time of the filing of said petition they were in possession of the automobile. . . 3. Defendants specifically deny that the plaintiff has any title to said automobile or any right of possession in and to same. 4. Defendants show further that . . said automobile was sold on May 24, 1938, pursuant to the laws of this State, as provided in

§§ 107-204 and 39-1203 of the 1933 Code of Georgia, . . for . . $325 to . . C. I. T. Corporation." During the progress of the trial the plaintiff abandoned the case as to the defendant Jackson, and the case proceeded against C. I. T. Corporation alone. The jury returned a verdict in favor of the plaintiff for $333.70; the court overruled C. I. T. Corporation's motion for new trial containing the general and certain special grounds; and to that judgment C. I. T. Corporation excepted.

It appears from the brief of evidence that Ira Lee Carter purchased the automobile in question from "A. E. Jackson, doing business as Rome Automobile Company," under a retention-of-title contract which recites that the balance due on the purchase-price of the automobile was $439.56, divided in twelve equal monthly payments of $36.63, and "evidenced by one promissory note of this date [December 9, 1937] bearing interest from maturity at highest lawful rate." Some of the pertinent provisions of said contract follow: "Purchaser agrees that title to the property . . is vested in seller and shall not pass to purchaser, irrespective of any retaking and redelivery to purchaser or the acceptance or negotiations of notes or granting of any renewals or extensions, until said deferred balance shall have been fully paid in money. . . If any instalment is not paid in full when due, or if purchaser fails to perform any of his obligations or to comply with any condition of this contract, or if the holder hereof shall deem itself insecure, the full amount unpaid hereunder, including any note given, shall without notice become due and payable forthwith. . . Purchaser agrees in any such case to deliver the property to the holder and the holder may, without any previous notice or demand for performance, and without legal process, enter any premises where the property may be found and take possession thereof and of anything found therein, after which the holder may at its option make such disposition of the property as it shall deem fit, and all payments made by purchaser shall be retained by holder as compensation for the use of the property while in purchaser's possession and not as a penalty, or the property may be sold with or without notice, at private sale, or at public sale at which the holder may purchase, and the proceeds, less the expense of taking, removing, holding, repairing, and selling the property, and less attorney's fees as above provided and the expense of liquidating any liens or

claims, shall be credited on the amount unpaid hereunder; or without such sale the fair market value of the property at the time of repossession may be credited upon the amount unpaid. In either event purchaser agrees to pay the balance forthwith as liquidated damages for the breach of this contract; any surplus shall be paid to purchaser. Purchaser agrees that he has not dealt with, and will not at any time in the future deal with, the seller as the agent of C. I. T. Corporation for any purpose whatsoever; and that if this contract is sold to C. I. T. Corporation purchaser will settle all claims against seller directly with it. . . . Acceptance of any payments after maturity, or waiver or condonation of any other breach or default, shall not constitute a waiver of any other or subsequent breach or default, and no waiver of or change in the terms of this contract or the accompanying note shall be binding on C. I. T. Corporation unless evidenced in writing signed by one of the officers. . . Purchaser . . acknowledges receipt of a true copy of this contract. . . . Purchaser acknowledges notice of the intended sale of this contract to C. I. T. Corporation." By a writing dated December 12, 1937, "Rome Automobile Co., by A. E. Jackson," sold, transferred, and assigned said conditional-sale contract, with all its rights thereunder, to C. I. T. Corporation.

On direct examination, Ira Lee Carter testified in part as follows: "On or about March 12 of this year . . . Mr. Smith, representing the C. I. T. Corporation, came to my home . . and asked me did I know whether they had canceled the insurance on this car, and I told him that I did, that Mr. Jackson and I had a talk about it. He says, 'You will have to go out and take out insurance on the car,' and I says that company sent me a paper which told me they had canceled it, and he says 'I don't know about that,' and I says 'Let me call Mr. Jackson,' and I did, and I had paid two notes, and he told me he would kinder let me know what to do about the car, and Mr. Jackson told me to pay those two notes and I did, and Mr. Jackson says 'There is a note due now, isn't there?' And I says 'It is due the 8th,' and he says 'You can suggest to him about taking that money and going to get insurance on the car,' and I did, and he says 'Let me call the company in Atlanta,' and I told him all right, to go ahead, and he called the C. I. T. in Atlanta, and they says no, they couldn't do that, that I would have to take out some insurance, and it was right

after four o'clock then, and I tried to get them to wait and I would have to go out and take insurance on it, and I didn't know anything about taking insurance on the car. I knew when I bought the car they had done that, and he suggested taking the car, and I says 'You be the judge as I can not keep you from taking it if you have the right,' and he pulled the car in. I had the insurance policy which you hand me at the time. I had a notification from the insurance company that they were going to cancel the insurance. I had not received any return premium of any kind in connection with it. . . As to whether the premium had been paid, I had paid that, I guess, when I paid the notes, that was included in the papers I executed at that time. . . I owed no premium at that time. . . He told me on account of the fact I had no insurance he would have to take it. . . I figure the car was worth $750. . . I never rented an automobile like that, and I don't know what they would charge you a month for it. I would reckon it would be reasonably worth around a dollar a day for hire; that would be pretty low."

On cross-examination, the witness swore: "The payments on this car were due on the 8th of each month, and I think I had made thirteen, twelve or thirteen. . . On this Terraplane coupé I had made about thirteen payments. . . At the time Mr. Smith came to see me there was one payment due on the 8th. He didn't mention that payment at all; that is not what he was talking about, he was talking about insurance. I never missed a payment with these people. . . I have not paid any payments on that car since I paid Mr. Jackson the last two. I got mixed about canceling the insurance and missed two of them and then I went and got that straightened up. . . I did receive a notice from the Paul Revere Fire Insurance Company, of Buffalo, New York, saying that this policy had been canceled. I took that up with Mr. Jackson. He is the only person to whom I talked about it, the one from whom I bought the car. I don't know whether he represents the insurance company." On redirect examination the witness testified: "These twelve receipts which you hand me are the ones I spoke of, there being one receipt for two payments, making thirteen in all. This was after this car had been refinanced. . . When I got this notice about this insurance, that is when I went to see Mr. Jackson about it, and that was paid. Mr. Smith nor

any one else said anything about past-due payments at the time. The only question was one of insurance. . . I did not object to anything of the kind. He said he was going to take the car and there wasn't anything I could do except he could take it." On re-cross-examination, the witness testified: "This document . . I call the insurance, that shows a total premium of $34.95. As to whether that is the premium on that policy, I don't know anything about that insurance premium. I thought I had paid it when I paid the note. I got the insurance policy."

B. R. Smith, sworn for the defendant, testified in part as follows: "I, as representative for the C. I. T. Corporation, went to see Mr. Carter, the plaintiff. . . ' The papers I had showed him to be three payments in arrears. He stated that he had previously paid two payments to Mr. Jackson, and I telephoned Mr. Jackson and he verified the two payments. I showed Mr. Carter a copy of a letter from our business department in New York, stating that he was in default in the $36.63 instalment for March, and Mr. Carter stated that he hadn't made the payment and went and 'phoned Mr. Jackson, and I then 'phoned Atlanta and talked to Mr. Goodyear, and Mr. Goodyear told him [Carter] the third payment would have to be paid and instructed me to bring in the car; and I showed him the copy of the contract and stated the remainder and balance was declared due forthwith. . . I showed a copy of the contract; this was attached to the assignment record which I had. I did not show him a copy of the note; I didn't have that. . . . At that time the January, February, and March payments were marked open, to be collected; and Mr. Carter stated that he had paid the January and February payments, which Mr. Jackson verified, and I called on him for the payment due March 9th, and he stated he couldn't make it. I told Mr. Carter if he could make this payment that would give him some additional time to get the insurance policy, because the Atlanta office stated that the car would have to be insured and the payment would have to be paid first. I didn't have anything to do with the insurance. I don't represent the Paul Revere Insurance Company. . . The car should have a value of some $700. I believe it would deliver from $980 to $1000 new. . ." On cross-examination, Mr. Smith testified in part: "Mr. Carter requested or rather stated that if they would return the money which he had paid for insurance he would

have the money necessary to pay the payment. . . They [C. I. T. Corporation] merely instructed me to tell Mr. Carter that the insurance rebate would be credited on the final payment of the account. I did not come to see him on the question of insurance; primarily my purpose was to collect three past-due payments. I did not know when I went out there that two had been paid. . . Mr. Carter told me at the time I arrived he had made two payments."

Ira Lee Carter, recalled, testified in part as follows: "I never sent this policy in to Paul Revere Insurance Company for cancellation, or to anybody else. I didn't take out any more insurance because I didn't have time. He just took the car. I don't know just what time it was I got that notice [about insurance]; something like a month before this happened, maybe a little longer. . . I had never received any notice through the mail or from the C. I. T. Corporation until Mr. Smith came. The policy was delivered by the C. I. T. Corporation to me. . . The date of this policy, if this is the date right here, is 12-9-37." B. R. Smith, recalled, swore: "As I testified yesterday, at the time I went out to Mr. Carter's house and discussed this matter with him I called up the Atlanta office of the C. I. T. and talked to Mr. N. A. Goodyear, and Mr. Carter also talked to Mr. Goodyear over the telephone in my presence."

Mr. N. A. Goodyear testified in part on direct examination: "My connection with the C. I. T. Corporation is credit manager of one department of the Atlanta office. I am a superior officer to Mr. Smith. I am familiar with the account of Mr. Ira Lee Carter . . as of March 12, 1938. On that date the account was three or four days delinquent on an instalment. . . The C. I. T. Corporation does not still own that contract . .; at the time it was repossessed it did, and it held that contract. . . The contract was purchased from the Rome Automobile Company here in Rome. On March 12, 1938, I talked to Mr. Carter over long-distance 'phone, being on the same date our Mr. Smith contacted Mr. Carter with reference to the account. The conversation I had with Mr. Carter first came about through Mr. Smith, who asked me about the delinquent instalment, and he then referred Mr. Carter to the 'phone in the same long-distance conversation with me, at which time I told him . . that the first two instalments had been delinquent.

. . I told him that the account must be paid then, and at the same time we must be furnished with an outside insurance policy, but the thing we were driving [for] at present was the delinquent account. . . My statement to Mr. Carter was that the account must be paid up to date, and at the same time the car must be covered with an active insurance policy, and that I was instructing Mr. Smith to repossess the car if the payment was not made and at the same time insurance furnished." On cross-examination the witness swore in part: "I did verify in my conversation with Mr. Carter Mr. Smith's statement that the premium could be credited on the final payment. Mr. Carter didn't tell me that he had the money to pay the past-due payment."

Leon Covington testified for the defendant as follows: "I handled and obtained this order for short-order sale. I was representing the C. I. T. Corporation, and the car was sold in accordance with this advertisement. I was present at that sale, the same being held . . by the sheriff on or about May 23, 1938. This car was put up at auction and sold by the sheriff, and I bid it in for the C. I. T. Corporation at $325 and paid that purchase-price of $325 to Mrs. Jenkins, the deputy sheriff and a lady who runs the sheriff's office, and after the automobile was sold I turned it over to the . . C. I. T. Corporation. The C. I. T. Corporation hasn't got any portion of the money for that."

Mrs. Ira Lee Carter testified for the plaintiff in part as follows: "The plaintiff is my husband and I live with him. I remember when a representative of the C. I. T. Corporation, introducing himself as Mr. Smith, came to my home. . . My husband asked him was he taking it [the automobile] because the note was behind two days . . , and this man says no, it was on account of the insurance being canceled, and he could not have the car on the streets. My husband told . . Mr. Smith that he had the money in his pocket to pay the note, and he said he wasn't after any pay on the note, he was after the insurance on it. He didn't say he was not a collector. We paid Mr. Jackson since they moved the C. I. T. office to Atlanta."

L. R. Holsenbach, sworn for the plaintiff, testified in part as follows: "I happened to be at his [Carter's] home . . when Mr. Smith . . was there, and heard a conversation that took place between them. Mr. Smith . . told Mr. Carter that he had or-

ders from the company to pull the car, that it didn't have any insurance on it, and Mr. Carter said he didn't know anything about that, didn't know where to get any insurance, so he calls Atlanta. I heard that conversation, the telephone being in the front room, and I was in there. When Mr. Smith hung up he told Mr. Carter he would have to run the car over to town. Mr. Carter didn't talk to the other man at all. I didn't pay much attention to Mr. Smith's end of the telephone conversation. I heard Mr. Carter offer to pay Mr. Smith, he told him if it was a note he would pay that, and he said he was not a collector, and said it was on account of insurance." On cross-examination the witness testified in part as follows: "I saw Mr. Carter with some money; I couldn't tell the exact amount. He didn't offer to pay Mr. Smith any money, pull any money out of his pocket, but he offered to pay a note; as to how much, they didn't discuss the amount. I was there the whole time Mr. Smith was there."

A. E. Jackson, sworn for the plaintiff, testified in part as follows: "I recall this year, sometime in March, when Mr. Smith came up from Atlanta to see Mr. Carter, and he first came to my office at the Rome Automobile Company. . . We didn't discuss how many payments were behind, but we talked about the insurance being canceled, and I also told him and showed him a letter where Mr. Carter had paid me two payments, and showed him where I had sent it to Atlanta, and the dates of the payments. I don't know if anything was said about back payments, but I know he asked me if I knew his insurance had been canceled, and I told him I had a copy of the letter to Mr. Carter stating that fact. Following that, Mr. Smith left my office to go out to see Mr. Carter, and then Mr. Carter called me up over the 'phone. Mr. Smith did not talk to me over the 'phone. Mr. Carter told me that he wanted to get an insurance policy from some outside company; he said he could buy an insurance policy or make the payment on the car but he couldn't do both; and I told him to ask if he couldn't get a thirty-day extension on his payment and take the money he was going to make his payment with and buy insurance." On cross-examination, the witness swore: "His intention was to get the money to make a payment or utilize the money which he did have to make a payment to buy insurance, he said he could make the payment, but couldn't do both, and I told him to ask for a

thirty-day extension and take the money and buy insurance. I don't know whether he asked for that, or I so advised him."

Leon Covington, recalled by the plaintiff, testified in part as follows: "I stated that Mrs. Jenkins told me yesterday she had the money for this matter. I gave her a cashier's check on some bank in Atlanta; told her it was hers, and I would like for her to hold it if she could do that until we got through with it. She told me yesterday that she still had it. There was no particular reason for me to tell her to hold it, because the money was already charged to the C. I. T. . . . I merely suggested that she could hold the check if she saw fit. There was no purpose for that."

At this juncture the check in question was offered in evidence. It came from the sheriff's office, had never been paid, was signed by C. I. T. Corporation, drawn on Central Hanover Bank & Trust Company of New York, dated May 26, 1938, for $325, payable to Wright & Covington, and indorsed by Wright & Covington to the order of M. E. Horton, sheriff. There was also introduced in evidence the following letter, addressed to Mrs. Florence Jenkins, deputy sheriff, Rome, Ga., dated May 28, 1938, and signed, Wright & Covington: "Re: Ira Carter v. C. I. T. Corp., et al. This car was sold a few days back and bought in by C. I. T. Corporation for $325. We are enclosing you herewith check of the C. I. T. Corporation, payable to our order for this amount, which we have in turn endorsed and made payable to the order of Mr. M. E. Horton, as sheriff. This case is to be disposed of at the coming July term of court and you can hold this check until the case is tried."

We agree with the view expressed in the brief of counsel for the plaintiff in error that "the general grounds of the original motion and the first two grounds of the amended motion for new trial present . . but the single question: was the verdict contrary to law and contrary to the evidence . . and was a verdict in behalf of the defendant demanded?" It appears from the evidence that at the time the agent of the defendant visited the plaintiff, the payment due March 8 was four days past due. According to the evidence of the defendant, said agent demanded that this instalment be paid and that plaintiff also procure instanter another "outside" policy of insurance on the car. It also appears from the evidence that at the time the plaintiff executed the refinancing con-

tract there was included in that contract an amount sufficient to pay for the required insurance on the car. The defendant appears to have had this insurance issued, for it sent the policy to the plaintiff, which policy the insurance company appears to have subsequently canceled. The defendant admits that it had not returned the premium due on the canceled policy, but says that it offered to give the plaintiff credit therefor on the last instalment of the purchase-price of the car when it fell due, and demanded that plaintiff raise an additional amount to pay for another premium on an "outside" policy on the car, making this last requirement also a condition precedent to plaintiff's retaining the car. The contract makes no such provision. The jury settled any issue of fact as to this point in favor of the plaintiff. The jury also settled in favor of the plaintiff the issue as to whether or not he had tendered to the defendant the payment due March 8. The jury also settled the issue as to whether the defendant had claimed or demanded the full amount due by reason of the plaintiff's failure to pay the March instalment promptly.

Moreover, although the contract provides that the holder of the same may, whenever it deems itself insecure, declare the full amount due and payable forthwith, without any notice to the purchaser, we do not think any court anywhere would construe such a provision as having literal effect, for in such event the holder might declare the full amount due whether any of the payments thereunder were past due or not. We think, however, that if the defendant is seeking to avail itself of this provision of the contract it has failed under the evidence to show proper performance on its own part. The agent who repossessed the car did not have the contract, and stated that it was in Atlanta. The purchaser had a right to demand as a condition precedent to the surrender of the car under the contract, or the payment of the entire amount of the note, that the seller also surrender the contract. This the seller did not do or offer to do. The evidence in this case was sufficient to warrant a finding by the jury that the defendant was claiming not only payment of the March instalment, which the plaintiff was tendering to it, but also that it was seizing the car because the plaintiff did not procure instanter another policy of insurance on the car, although the plaintiff then had with it sufficient funds and credit to pay for the required insurance on the car. While it

is true that, under the terms of the contract, a default in the prompt payment of any instalment becoming due thereunder automatically renders the entire indebtedness due (see, in this connection, *Tiedeman Mortgage & Finance Co.* v. *Carlson,* 41 *Ga. App.* 406 (152 S. E. 909), and cit.), it will appear from an examination of all the authorities cited in support of this principle, including the *Tiedeman* case, that it was applied in proceedings where a *suit was filed for the full amount of the contract.* In the present case, for the holder of the contract to seize the car and sell it for its own benefit without the consent of the purchaser, it must appear that it has done all that was required of it under the terms of the contract, and, also, that it holds the note. The holder of the note evidently had procured the policy of insurance, for it sent the policy to the purchaser. If the insurance company canceled the policy it had to return the unearned premium. The fact that the defendant stated that it would allow this unearned premium credited on the last payment to be made shows that this unearned premium was returned to it. It could not refuse to accept the instalment due March 8, and also demand that the purchaser pay for another insurance policy on the car and, because of this failure, seize the car and sell it for its own benefit. Such seizure was wrongful and authorized the bringing of this trover action. *White* v. *Dolson,* 41 *Ga. App.* 436 (153 S. E. 233). There was ample evidence to authorize a verdict in favor of the plaintiff, and the remaining special grounds disclose no reversible error.

*Judgment affirmed. MacIntyre and Guerry, JJ., concur.*